Neama Rahmani (State Bar No. 223819)
 *efilings@westcoasttriallawyers.com*
Ronald L. Zambrano (State Bar No. 255613)
 *ron@westcoasttriallawyers.com*
WEST COAST EMPLOYMENT LAWYERS, APLC
1147 South Hope Street
Los Angeles, California 90015
Telephone: (213) 927-3700
Facsimile: (213) 927-3701

Attorneys for Plaintiff,
ASHA DANIELS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHA DANIELS, as an Individual, <br><br> Plaintiffs, <br><br> v. <br><br> BIG GRRRL BIG TOURING, INC, a Delaware Corporation; MELISSA JEFFERSON (aka "LIZZO"), as an Individual; CARLINA GUGLIOTTA, as an Individual; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No.: 2:24-cv-03571-FLA-PVC <br><br> Assigned for All Purposes to <br> District Judge: Hon. Fernando L. Aenlle-Rocha <br> Magistrate Judge: Hon. Pedro V. Castillo <br><br> **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT BIG GRRRL BIG TOURING, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** <br><br> Date: August 22, 2025 <br> Time: 1:30 p.m. <br> Hon. Fernando L. Aenlle-Rocha <br> Courtroom: 6B <br><br> Action Filed: September 21, 2023 <br> Removed: April 30, 2024 <br> Trial Date: December 1, 2025 |

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................... 1

II.   FACTUAL BACKGROUND ....................................................................... 1

III.  LEGAL STANDARD .............................................................................. 3

IV.   LEGAL ARGUMENT IN OPPOSITION ................................................... 4

  A.  Genuine Dispute of Fact as to Sexual Harassment ............................ 4

    1.  Sexual Innuendo with Penis Candy and Penis Filled Pictures Creates a Hostile Work Environment Based on Sex. ............................................... 5

    2.  The Sexual Orientation of the Person Creating the Hostile Environment is Not a Factor in the Analysis ................................................................. 7

  B.  Genuine Dispute as to Racial Harassment ......................................... 8

    1.  Nomura Racially Making Fun of Other Black Woman Created the Hostile Work Environment Based on Race ............................................. 9

  C.  Genuine Disputes as to the Disability Claims .................................. 10

    1.  Plaintiff Was Disabled ...................................................................... 11

    2.  Failing to Accommodate is the Causation ....................................... 12

  D.  Genuine Dispute as to Retaliation Claims ....................................... 13

    1.  Title VII Retaliation ......................................................................... 13

    2.  ADA Retaliation ............................................................................... 17

    3.  FLSA Retaliation .............................................................................. 18

V.    CONCLUSION ....................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*389 Orange Street Partners v. Ciarcia,*
  179 F.3d 656 (9th Cir.1999) ................................................................15

*Adetuyi v. City and County of San Francisco,*
  (N.D. Cal. 2014) 63 F.Supp.3d 1073 ...................................................14

*Anderson v. Liberty Lobby, Inc.,*
  (1986) 477 US 242 .................................................................................4

Brown v. City of Tucson,
  336 F.3d 1181 (9th Cir. 2003) .......................................................17, 18

Christian v. Umpqua Bank,
  984 F.3d 801 (9th Cir. 2020) ...........................................................5, 6

Cruz v. Coach Stores, Inc.,
  (2nd Cir. 2000) 202 F3d 560 ..........................................................9, 10

*Eddy v. Virgin Islands Water and Power Authority,*
  256 F.3d 204 (3d Cir.2001) ..................................................................15

*Edwards v. Occidental Chem. Corp.,*
  892 F.2d 1442 (9th Cir.1990) ..............................................................15

EEOC v. Dolgencorp, LLC,
  (6th Cir. 2018) 899 F3d 428 ..........................................................12, 13

*Eminence Capital, L.L.C. v. Aspeon, Inc.,*
  316 F.3d 1048 (9th Cir.2003) .......................................................16, 17

*Exby-Stolley v. Board of County Commrs.,*
  (10th Cir. 2020) 979 F3d 784 ..............................................................12

*Faragher v. City of Boca Raton,*
  (1998) 524 US 775 .................................................................................4

*Foman v. Davis,*
  371 U.S. 178 (1962) ..............................................................................16

Freeman v. Dal-Tile Corp.,

   (4th Cir. 2014) 750 F3d 413 .................................................................4

*Gales v. California Dept. of Corrections & Rehabilitation Ventura Youth Correctional*

   *Facility*,

   (CD CA 2021) 2021 WL 342571 ...................................................4, 8, 9

*Gregory v. Daly*,

   (2nd Cir. 2001) 243 F3d 687 ..............................................................4

*Grisham v. Philip Morris, Inc.*,

   (C.D. Cal. 2009) 670 F.Supp.2d 1014................................................15, 16

*Harris v. Forklift Systems, Inc.*,

   (1993) 510 US 17 .......................................................................4, 5, 6

*Jackson v. Federal Express*,

   (2nd Cir. 2014) 766 F3d 189 .............................................................3

*Kaplan v. Rose*,

   49 F.3d 1363 (9th Cir.1994) ..........................................................15, 16

Kennedy v. Applause, Inc.,

   (9th Cir. 1996) 90 F3d 1477..............................................................11

*Lopez v. Smith*,

   203 F.3d 1122 (9th Cir.2000) ...........................................................16

*McGinest v. GTE Service Corp.*,

   (9th Cir. 2004) 360 F3d 1103..........................................................8, 10

*Meritor Sav. Bank, FSB v. Vinson*,

   (1986) 477 US 57 ...........................................................................4

*National R.R. Passenger Corp. v. Morgan*,

   (2002) 536 US 101, fn. 10 .................................................................8

Natofsky v. City of New York,

   (2nd Cir. 2019) 921 F3d 337 .............................................................9

*Noll v. Carlson*,

   809 F.2d 1446 (9th Cir.1987) ................................................................16

*Oncale v. Sundowner Offshore Servs., Inc.*,

   523 U.S. 75.................................................................................................5

Pardi v. Kaiser Foundation Hospitals,

   389 F.3d 840 (9th Cir. 2004) ..........................................................17, 18

*Passantino v. Johnson & Johnson Consumer Products, Inc.*,

   (9th Cir. 2000) 212 F3d 493....................................................................13

*Poland v. Chertoff*,

   494 F.3d 1174 (9th Cir.2007) ..................................................................14

*Ray v. International Paper Co.*,

   (4th Cir. 2018) 909 F3d 661......................................................................4

*Reeves v. C.H. Robinson Worldwide, Inc.*,

   594 F.3d 798 (11th Cir. 2010) ..............................................................5, 6

*Rene v. MGM Grand Hotel, Inc.*,

   (9th Cir. 2002) 305 F.3d 1061 ...................................................................7

Reynaga v. Roseburg Forest Prods.,

   847 F.3d 678 (9th Cir. 2017) .....................................................................7

*Roberts v. Arizona Bd. of Regents*,

   661 F.2d 796 (9th Cir.1981) ....................................................................16

*Sharp v. S&S Activewear, L.L.C.*,

   (9th Cir. 2023) 69 F.4th 974.................................................................5, 7

*Simons v. United States*,

   497 F.2d 1046 (9th Cir.1974) ..................................................................15

*Smith v. Blackledge*,

   451 F.2d 1201 (4th Cir.1971) ..................................................................15

*Smothers v. Solvay Chemicals, Inc.*,

   (10th Cir. 2014) 740 F3d 530...................................................................11

-III-

TABLE OF AUTHORITIES

Steiner v. Showboat Operating Co.,

25 F.3d 1459 (9th Cir. 1994) .................................................................5, 6

*Stewart v. Masters Builders Ass'n of King & Snohomish Cntys.*,

736 F. Supp. 2d 1291 ...........................................................................18

Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material

Fact,

(1984) 99 FRD 465, 466 .........................................................................3

*University of Texas Southwestern Med. Ctr. v. Nassar,*

(2013) 570 US 338 ...............................................................................14

*Vance v. Ball State Univ.,*

(2013) 570 US 421 ...............................................................................4

*West v. PBC Management LLC,*

(N.D. Cal. 2024) 754 F.Supp.3d 914 ........................................................17

*Yartzoff v. Thomas,*

809 F.2d 1371 (9th Cir.1987) .................................................................14


**Statutes**                                                                       **Page(s)**

42 U.S.C. § 12203(a) ............................................................................17

42 USC § 12102(1) .............................................................................11


**Rules**                                                                          **Page(s)**

Fed.R.Civ.P. 15(a)(2) ..........................................................................15

FRCP 56(a) ......................................................................................3

Rule 15 .........................................................................................16


**Regulations**                                                                    **Page(s)**

29 CFR § 1630.2(g) .............................................................................11

**MEMORANDUM OF POINTS AND AUHTORITIES**

## I.    INTRODUCTION

Plaintiff was fired after making complaints of sexually hostile environment, a racially discriminatory environment, and for seeking accommodations for her injured ankle.  Defendants are not sure why she was fired.  Amanda Nomura, Plaintiff's supervisor, testified Plaintiff quit.  The Tour Manager, Carlina Gugliotta, testified the friction between Plaintiff and Nomura resulted in it just "not working out."  Suffice to say, there are genuine disputes of fact with regards to Plaintiff's claims, and the present motion should be denied.

## II.    FACTUAL BACKGROUND

In September 2022, Daniels designed custom wardrobe pieces for Lizzo's background dancers, work that later prompted her recruitment to the tour. (SSG Nos. 13, 14.) In January 2023, Wardrobe Manager Amanda Nomura—acting for Lizzo's management—personally contacted Daniels, promised she would not be required to perform strenuous physical labor, and recommended her for the Wardrobe Assistant position. (SSG Nos. 3, 6, 8.) Daniels then canceled other professional commitments, including a scheduled fashion show, to accept the role. (SSG No. 7.) On February 14, 2023, she began work as a joint employee of BGBT and CAPS and reported directly to Nomura, who controlled her duties, breaks, movements, and ultimate termination despite lacking formal firing authority. (SSG Nos. 4, 5.) Daniels traveled with the tour through multiple European cities and often worked from 6:00 a.m. until as late as 2:00 a.m., seven days a week, with few or no breaks. (SSG Nos. 12, 138, 139.) Although the tour promoted inclusivity, Daniels was instructed not to speak with Lizzo and to "tone it down" to avoid making Lizzo jealous, and she maintains discrimination occurred despite the diverse cast. (SSG Nos. 15, 16, 88.)

Nomura imposed racially targeted restrictions by refusing Daniels's requests for larger dressing rooms, mirrors, and extra stockings for the Big Grrrls and the opening act. (SSG Nos. 64, 65, 66, 67.) She ordered security to monitor Black artist Bree

-1-

Runway and her entourage on social media to find a pretext for their removal. (SSG Nos. 68, 69, 70.) Nomura mocked a Big Grrrl by snapping her fingers in a racially stereotypical gesture, imitated Black women in a demeaning manner, ridiculed dancers as "fat," laughed when they soiled costumes, and referred to Beyoncé with a racial slur. (SSG Nos. 71, 72, 73, 74, 75, 76, 77, 78, 79.) She also sent three local workers home for being "dumb" or "lazy" and berated other crew members regardless of race, abuse Daniels reported to Tour Manager Carlina Gugliotta both orally and by text. (SSG Nos. 80, 81, 82, 83, 84, 85, 86.) Daniels herself was labeled "sexually appealing" and told she could not interact with Lizzo, yet she continued to perform her duties successfully and often exceeded expectations. (SSG Nos. 87, 89, 63, 90.)

Physically hazardous conditions compounded the hostility. In mid-February 2023, Nomura ran a rolling wardrobe rack over Daniels's right foot and then shoved her when she attempted to rest, causing bruising and swelling; Nomura forced her to keep working in painful shoes, denied her requests to sit, and ignored her plea to move from an upper to a lower bunk. (SSG Nos. 91–104.) Daniels's acrylic nails later snapped below the nailbeds and bled; she requested proper bandages and medical treatment but received only Band-Aids. (SSG Nos. 105–108, 131, 132.) On March 5, 2023, she suffered an allergic reaction—swelling, itchiness, and disorientation—but, despite notifying Nomura and Gugliotta and asking to see a doctor, received no professional care; a chef eventually provided an over-the-counter pill. (SSG Nos. 109–114, 133, 134, 135.) Daniels disputes Defendants' claim that an on-site medical team was available and states she was forced to work without accommodations. (SSG Nos. 125, 126.)

Daniels also faced a sexually hostile atmosphere. A backstage equipment case was decorated with graphic images of male genitalia—later shared in the Crew WhatsApp group—and management took no remedial action. (SSG Nos. 32, 34, 36, 37, 38.) A coworker named Kyle carried penis-shaped candies, made lewd gestures, and told sexual jokes in her workspace, conduct Daniels reported to Gugliotta. (SSG Nos. 51, 52, 53.) During a bus ride to Amsterdam, Nomura and others openly discussed

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

hiring sex workers, attending sex clubs, and using hard drugs; similar conversations continued after arrival. (SSG Nos. 26, 27, 31, 41, 42, 43, 44, 45.) Daniels relayed these incidents to Gugliotta verbally and in writing and asserts the sexual content substantially contributed to a hostile environment supporting her Title VII and ADA claims. (SSG Nos. 30, 46, 54, 55, 56, 59, 60, 61, 62, 17.)

Daniels repeatedly complained that she was "worked to the bone," denied breaks, and forced to remain on call during supposed rest days, raising these concerns in person and by text to both Nomura and Gugliotta. (SSG Nos. 138, 139.) On March 5, 2023, while still experiencing her allergic reaction, she was abruptly told she would be flown home that evening; she received no reason and soon received flight details confirming her removal. (SSG Nos. 1, 2, 9, 10, 136.) Gugliotta admitted Nomura "wanted her gone," even though Nomura lacked formal firing authority. (SSG Nos. 127, 128, 137, 140.) Daniels was paid through March 17 but prevented from completing the engagement. (SSG Nos. 11, 141.) Defendants later cited safety or interpersonal issues, but Daniels contends those reasons are pretextual because she had been recruited for her design talent, expressed no intention to leave, and received praise from performers and management. (SSG Nos. 140, 141.)

## III.   LEGAL STANDARD

The basic standard for granting summary judgment is that the court must find there is "*no* genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." (FRCP 56(a) (emphasis added).)

Therefore, the critical issues in ruling on a motion for summary judgment are: Does the dispute involve an issue of "fact"?; Is the fact "material"?; and Is the dispute "genuine"? In addition, the court must "determine whether the legal theory of the motion is sound." (*Jackson v. Federal Express* (2nd Cir. 2014) 766 F3d 189, 194.) Trial courts attempt to serve the twin aims of (a) properly disposing of cases in which there is no genuine issue as to any material fact, while (b) protecting parties' right to trial when there are such disputed facts. (See Schwarzer, Summary Judgment Under the

Federal Rules: Defining Genuine Issues of Material Fact (1984) 99 FRD 465, 466.)
Summary judgment is a drastic remedy and is therefore to be granted cautiously:
"Neither do we suggest that the trial courts should act other than with caution in granting
summary judgment …" (*Anderson v. Liberty Lobby, Inc.* (1986) 477 US 242, 255.)

## IV.    LEGAL ARGUMENT IN OPPOSITION

### A.    Genuine Dispute of Fact as to Sexual Harassment

"Since an employee's work environment is a term or condition of employment,
Title VII creates a hostile working environment cause of action." [Freeman v. Dal-Tile
Corp. (4th Cir. 2014) 750 F3d 413, 420.   To state a prima facie case for "hostile
environment" sexual harassment under Title VII, plaintiff must allege that:

- plaintiff was subjected to unwelcome sexual advances, conduct or comments;
- the harassment complained of was based on sex; and
- the harassment was "so severe or pervasive" as to "alter the conditions of the victim's employment and create an abusive working environment." (*Meritor Sav. Bank, FSB v. Vinson* (1986) 477 US 57, 67.)

There is no requirement that plaintiff suffer loss of tangible job benefits or actual
injury in order to state a hostile environment harassment claim. [See *Harris v. Forklift
Systems, Inc.* (1993) 510 US 17, 21;  *Gregory v. Daly* (2nd Cir. 2001) 243 F3d 687, 691;
*Gales v. California Dept. of Corrections & Rehabilitation Ventura Youth Correctional
Facility* (CD CA 2021) 2021 WL 342571, *22]

As an overall note, Nomura was a supervisor under both the ADA and Title VII.
An employee is a "supervisor" for purposes of vicarious liability under Title VII when
he or she is empowered by the employer to take tangible employment actions against
the victim—"i.e., to effect a significant change in employment status, such as hiring,
firing, failing to promote, reassignment with significantly different responsibilities, or
a decision causing a significant change in benefits." (*Vance v. Ball State Univ.* (2013)
570 US 421, 429; *Faragher v. City of Boca Raton* (1998) 524 US 775, 803—power to
supervise is power "to hire and fire, and to set work schedules and pay rates"; *Ray v.*

-4-

International Paper Co. (4th Cir. 2018) 909 F3d 661, 668—supervisory power may include power to eliminate voluntary overtime opportunity.)  Here, per the Tour Manger, Carlina Gugliotta, Nomura had the ability to decided whether Plaintiff could continue to work for her.  (SSG No. 5.)  This is an additional to Nomura's own testimony that Nomura supervised Plaintiff's work and reprimanded Plaintiff for not working all hours required.  (SSG No. 5.)  Based thereon, to the extent any unlawful conduct is attributed to Nomura, as a supervisor, Defendant BGBT is vicariously liable for that same conduct.

### 1.  *Sexual Innuendo with Penis Candy and Penis Filled Pictures Creates a Hostile Work Environment Based on Sex.*

The offensive conduct must be "sufficiently severe or pervasive to alter the conditions of employment." Christian v. Umpqua Bank, 984 F.3d 801, 809 (9th Cir. 2020). "It is enough," we have held, "if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." Steiner v. Showboat Operating Co., 25 F.3d 1459, 1463 (9th Cir. 1994). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).

Context matters. *Sharp v. S&S Activewear, L.L.C.* (9th Cir. 2023) 69 F.4th 974, 978. Workplace conduct is to be viewed cumulatively and contextually, rather than in isolation. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (en banc). This approach makes common sense in order to screen out one-off, isolated events and yet benchmark conduct in the context of a specific workplace. Objectionable conduct is not "automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80.)

//

Here, Daniels presents evidence that a jury could find satisfies each element of a prima facie hostile-environment claim. A backstage equipment case emblazoned with photographs of erect penises remained in plain view for weeks and was later photographed and circulated in the crew's WhatsApp group after management took no remedial action, despite Daniels's complaints to Tour Manager Carlina Gugliotta (SSG Nos. 32, 34, 36–38, 30, 54, 59). A male coworker, Kyle, routinely carried penis-shaped candies, made lewd gestures, and told sexual jokes in the small wardrobe room where Daniels worked, conduct she likewise reported (SSG Nos. 51–53). During the overnight bus ride to Amsterdam, Nomura and other managers openly discussed hiring sex workers, attending live sex shows, and using hard drugs, and those conversations continued after arrival (SSG Nos. 26, 27, 31, 41–45). Daniels neither invited nor welcomed any of this conduct; to the contrary, she reported it to management, which ignored her complaints, allowing the behavior to persist (SSG Nos. 55, 56, 60–62).

These incidents were plainly "sexually charged," distinguishing them from mere vulgarity and satisfying the requirement that the harassment be "based on sex." *Christian v. Umpqua Bank,* 984 F.3d 801, 809 (9th Cir. 2020). They also meet Title VII's severity-or-pervasiveness threshold. The pornography-laden case and Kyle's daily penis-candy routine were physical, visual, and verbal intrusions into Daniels's workspace that "pollute[d] the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994). The conduct spanned multiple cities over several weeks, was perpetrated or condoned by supervisory personnel, and was amplified by management's decision to ignore Daniels's complaints, facts that a reasonable jury could view as rendering the environment abusive under *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Context matters: when the evidence is "viewed cumulatively and contextually, rather than in isolation," *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (en banc), the steady drumbeat of penis imagery, lewd jokes, and sex-worker discussions—coupled with

1 management's ratification—easily surpasses the "one-off" threshold for actionable

2 harassment recognized in *Sharp v. S&S Activewear, L.L.C.*, 69 F.4th 974, 978 (9th Cir.

3 2023).

4 Because Daniels has produced evidence that she was subjected to unwelcome,

5 sex-based conduct that was sufficiently severe or pervasive to alter the conditions of her

6 employment—and because the record shows management knew of the conduct and

7 failed to act—there is at minimum a genuine dispute of material fact precluding

8 summary judgment on her Title VII hostile-environment claim. (SSG Nos. 1–141.)

9 **2.** ***The Sexual Orientation of the Person Creating the Hostile***

10 ***Environment is Not a Factor in the Analysis***

11 "[A]n employee's sexual orientation is irrelevant for purposes of Title VII. (*Rene*

12 *v. MGM Grand Hotel, Inc.* (9th Cir. 2002) 305 F.3d 1061, 1063.) Notably, individual

13 targeting is not required to establish a Title VII violation. See Reynaga v. Roseburg

14 Forest Prods., 847 F.3d 678, 687 (9th Cir. 2017).

15 Here, Defendants contend that Kyle's gestures of "licking dicks" and his daily

16 display of penis-shaped candy cannot give rise to liability because Kyle is a gay man,

17 but *Rene* forecloses that argument. Kyle's conduct injected graphic sexual content into

18 Daniels's small workspace, regardless of his orientation, and Daniels reported it as

19 unwelcome and offensive. (SSG Nos. 51–53.) Defendant's own management then

20 allowed the conduct to continue unabated, further reinforcing its workplace impact.

21 (SSG Nos. 30, 54, 59.)

22 Nor can Defendants evade liability by asserting that Kyle's behavior was not

23 always aimed directly at Daniels. Under *Reynaga*, Title VII protects employees from an

24 environment "permeated" with sexually charged hostility, even when the offensive acts

25 are not individually targeted. Daniels worked in close proximity to Kyle's penis-candy

26 routine, the pornographic equipment case, and open discussions of sex workers and live

27 sex shows—all of which transformed her workspace into a sexualized arena. (SSG Nos.

28 26–38, 41–45, 51–56, 60–62.) A reasonable jury could conclude that this cumulative

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

atmosphere altered the conditions of her employment.

Because the record shows (1) undisputedly sexual conduct, (2) no legal relevance to the perpetrator's orientation, and (3) a workplace permeated by persistent sexual imagery and conversation, genuine issues of material fact remain as to whether Defendants created or tolerated a hostile environment in violation of Title VII. (SSG Nos. 1–141.)

### B.    Genuine Dispute as to Racial Harassment

To succeed on a hostile work environment claim based on race, the plaintiff must demonstrate: '(1) that he was subjected to verbal or physical conduct of a racial ... nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment.   (Gales v. California Department of Corrections and Rehabilitation Ventura Youth Correctional Facility (C.D. Cal., Jan. 28, 2021, No. CV 19-5025-GW-AGRX) 2021 WL 342571, at *24)

Allegations of a racially hostile workplace must be assessed from the perspective of a reasonable person belonging to the same racial or ethnic group as the plaintiff. [See *National R.R. Passenger Corp. v. Morgan* (2002) 536 US 101, 116, fn. 10; *McGinest v. GTE Service Corp.* (9th Cir. 2004) 360 F3d 1103, 1115—recognizing that certain words or conduct that appear innocent to nonmembers of the group may be "intolerably abusive" to members of the targeted group; see Gales v. California Dept. of Corrections & Rehabilitation Ventura Youth Correctional Facility (CD CA 2021) 2021 WL 342571, *24]

Here, Daniels—a Black wardrobe assistant—was subjected to a drumbeat of racially charged conduct. Nomura repeatedly referred to Black women on the tour, including dancers and Daniels herself, as "dumb," "useless," and "fat," mocked their bodies, and laughed when they soiled costumes (SSG Nos. 74–79). She snapped her fingers while mimicking a Big Grrrl in front of management, a gesture Daniels recognized as a stereotypical caricature of Black women (SSG Nos. 71–73). Security

was ordered to surveil Black artist Bree Runway and her team "to find something to send them home," an instruction Daniels perceived as racially motivated (SSG Nos. 68–70). Nomura denied Black dancers basic items such as mirrors, larger dressing rooms, and extra stockings—even when inventory was available—while telling Daniels not to remedy the situation, conduct Daniels understood as race-based micro-aggressions (SSG Nos. 64–67). Daniels herself was labeled "sexually appealing" and warned not to interact with Lizzo because of jealousy concerns, further underscoring how race and gender stereotypes were wielded to isolate her (SSG Nos. 87–89). Daniels reported these abuses to Tour Manager Gugliotta, yet management took no effective action, permitting the hostility to persist (SSG Nos. 83–86).

Viewed cumulatively and from the perspective of a reasonable Black woman, this pattern of racial slurs, stereotyping, and disparate treatment easily satisfies the "severe or pervasive" requirement articulated in *Gales*. The insults targeted core aspects of Daniels's identity, were endorsed—or at least tolerated—by supervisory personnel, and permeated her daily working conditions, thereby "alter[ing] the conditions of [her] employment and creat[ing] an abusive working environment" under *Morgan* and *McGinest*. Accordingly, genuine issues of material fact preclude summary judgment on Daniels's Title VII hostile-environment claim based on race. (SSG Nos. 1–141.)

1.    ***Nomura Racially Making Fun of Other Black Woman Created the Hostile Work Environment Based on Race***

Because the inquiry focuses on the workplace environment as a whole, a hostile environment may exist even if some of the hostility is directed at other workers. Thus, where racial slurs have been directed at a minority race of which plaintiff is a member, similar slurs directed at other minorities may contribute to the overall hostility of the working environment. [Cruz v. Coach Stores, Inc. (2nd Cir. 2000) 202 F3d 560, 570 (superseded by statute on other grounds as recognized by Natofsky v. City of New York (2nd Cir. 2019) 921 F3d 337, 354)—Hispanic employee could complain of hostile environment based on personnel manager's frequent use of Black racial slur in her

1   presence and slurs re Hispanics behind her back; *McGinest v. GTE Service Corp.* (9th
2   Cir. 2004) 360 F3d 1103, 1117—"if racial hostility pervades a workplace, a plaintiff
3   may establish a violation of Title VII, even if such hostility was not directly targeted at
4   the plaintiff"]

5        Here, Nomura's repeated ridicule of other Black women on the tour
6   independently contributes to the hostile racial environment Daniels endured because
7   Title VII looks to the workplace atmosphere as a whole, not solely to insults aimed
8   directly at the plaintiff. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000);
9   *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1117 (9th Cir. 2004). Nomura openly
10  mocked the Big Grrrl dancers by snapping her fingers and imitating stereotypical
11  "Black-woman" mannerisms, actions Daniels witnessed in the presence of management
12  (SSG Nos. 71–73). She called Black dancers "dumb," "useless," and "fat," laughed
13  when they soiled costumes, and repeated a racial slur directed at Beyoncé—all while
14  Daniels was within earshot (SSG Nos. 74–79). Nomura further ordered security to
15  monitor Black artist Bree Runway and her entourage on social media in an effort to
16  remove them from the tour, a directive Daniels understood as racially motivated (SSG
17  Nos. 68–70). By denying Black dancers simple necessities like mirrors, larger dressing
18  rooms, and replacement stockings—while instructing Daniels not to intervene—
19  Nomura reinforced a climate of race-based degradation that Daniels was forced to
20  observe daily (SSG Nos. 64–67).

21       These incidents, although sometimes directed at others, "pervade[d] the
22  workplace" and would be "intolerably abusive" to a reasonable Black employee,
23  thereby satisfying the "severe or pervasive" element of a racial hostile-environment
24  claim under *Cruz* and *McGinest* (SSG Nos. 1–141).

25       **C.    Genuine Disputes as to the Disability Claims**

26       To prevail in an ADA action, plaintiff must establish that plaintiff: has a
27  "disability"; is a "qualified individual" capable of performing the essential functions of
28  the job either with or without reasonable accommodation; and was unlawfully

-10-

discriminated against because of their disability. [Kennedy v. Applause, Inc. (9th Cir. 1996) 90 F3d 1477, 1481

      **1.**    ***Plaintiff Was Disabled***

"Disability" means, with respect to an individual: "(A) a *physical or mental impairment* that *substantially limits* one or more *major life activities*; "(B) a *record* of such an impairment; *or* being *regarded* as having such an impairment." [42 USC § 12102(1) (emphasis added); 29 CFR § 1630.2(g); see *Smothers v. Solvay Chemicals, Inc.* (10th Cir. 2014) 740 F3d 530, 545—by not contesting employee's evidence on *each* definition of disability, employer "came perilously close to waiving its arguments on this issue" (summary judgment for employer reversed)]

Here, "Disability" includes "a physical or mental impairment that substantially limits one or more major life activities," a record of such an impairment, or being regarded as having one. 42 U.S.C. § 12102(1). Daniels's rolled ankle left her in constant pain, limited her ability to stand, walk, climb into an upper bunk, and lift heavy cases, and required orthopedic footwear. (SSG Nos. 91–104.) She suffered bleeding nail-bed injuries that restricted manual tasks and, on March 5, experienced an allergic reaction that caused swelling, itchiness, disorientation, and visible distress. (SSG Nos. 105–108, 109–114, 131–135.) Management's awareness of these conditions—evidenced by Daniels's requests to sit, move bunks, receive bandages, ice, or a doctor—establishes both a record of impairment and that she was at least regarded as disabled. (SSG Nos. 125–126.)

Despite her impairments and the lack of medical care, Daniels consistently fulfilled her duties, received positive feedback, and "went above and beyond" her role. (SSG Nos. 63, 90.) Her requests—to sit while working, switch to a lower bunk, obtain basic medical supplies, and see a doctor—were modest accommodations that would have enabled her to continue performing essential functions safely. (SSG Nos. 91–108, 131–135.)

//

-11-

## 2. *Failing to Accommodate is the Causation*

If the employee has provided notice to the employer of their disability, resulting limitations, and a requested accommodation, the employer's failure to provide a reasonable accommodation for the disability provides the required nexus between the disability and the alleged discrimination. No evidence of discriminatory intent is necessary. (*Exby-Stolley v. Board of County Commrs.* (10th Cir. 2020) 979 F3d 784, 797—no adverse action required in failure to accommodate case)

Indeed, the failure to provide a reasonable accommodation can itself be direct evidence of discrimination. [See EEOC v. Dolgencorp, LLC (6th Cir. 2018) 899 F3d 428, 434-435]

Here, Daniels repeatedly put Defendants on notice of her impairments, the limitations they imposed, and the modest accommodations she required—yet management consistently refused to act. She informed Nomura and Gugliotta that the rolling-rack injury left her ankle swollen and painful, asked to sit while working, and requested a lower bunk, ice, pain medication, and access to a doctor (SSG Nos. 91–104, 128–130). She alerted them that her acrylic nails had broken below the nailbeds, bled, and required protective bandaging beyond the Band-Aids offered (SSG Nos. 105–108, 131, 132). On March 5, she reported an allergic reaction that caused visible swelling and disorientation and again asked to see a medical professional and to rest (SSG Nos. 109–114, 133–135). Despite these explicit requests—each of which constitutes notice under *Exby-Stolley v. Board of County Commissioners*, 979 F.3d 784, 797 (10th Cir. 2020)—Defendants provided no reasonable accommodation, insisting instead that Daniels continue strenuous labor in painful shoes, climb into an upper bunk, and treat serious injuries with inadequate supplies (SSG Nos. 125, 126, 130–132, 135). Under *Exby-Stolley*, that refusal alone supplies the requisite causal nexus between Daniels's disabilities and Defendants' discriminatory conduct; no additional proof of intent is needed. The timing amplifies the inference: within hours of renewing her accommodation request for medical care on March 5, Daniels was told she was being

-12-

1  sent home, and Gugliotta confirmed Nomura "wanted her gone" (SSG Nos. 133–137).

2  This sequence is "direct evidence of discrimination" under *EEOC v. Dolgencorp, LLC*,

3  899 F.3d 428, 434–435 (6th Cir. 2018), because the very act of denying

4  accommodations—followed immediately by termination—demonstrates a genuine

5  dispute of fact whether Defendants violated the ADA.

6        **D.    Genuine Dispute as to Retaliation Claims**

7               **1.    *Title VII Retaliation***

8        To establish a prima facie case, plaintiff must show that: plaintiff engaged in

9  a *protected activity;* the employer subjected plaintiff to an *adverse employment action*;

10  and a *causal link* exists between the protected activity and the employer's action.

11  (*Passantino v. Johnson & Johnson Consumer Products, Inc.* (9th Cir. 2000) 212 F3d

12  493, 506.)

13        Here, Daniels engaged in protected activity when she repeatedly complained to

14  Tour Manager Gugliotta about the racially hostile conditions created by Nomura, the

15  sexually charged imagery and conversations permeating the wardrobe area, and the

16  denial of basic accommodations for Black dancers and herself (SSG Nos. 30, 46, 54,

17  59, 83–86, 127–128). She also objected to working seven-day weeks without breaks

18  and to being forced to remain on call during supposed rest days—complaints that

19  challenged employment practices she reasonably believed were unlawful under Title

20  VII (SSG Nos. 138–139). Defendants then subjected her to an adverse employment

21  action by firing her on March 5, 2023, and putting her on a same-day flight home (SSG

22  Nos. 1, 2, 136). The causal connection is evident from the close temporal proximity—

23  her complaints spanned the weeks immediately preceding her termination—and from

24  Gugliotta's admission that Nomura "wanted her gone," which followed Daniels's

25  persistent reports of discrimination and harassment (SSG Nos. 133–137, 140). Under

26  *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 506 (9th Cir.

27  2000), this evidence creates a genuine dispute of material fact on all three prima facie

28  elements of Title VII retaliation.

1    Here, Plaintiff must prove that "the unlawful retaliation would not have occurred

2   in the absence of the alleged wrongful action or actions of the employer." (*University*

3   *of Texas Southwestern Med. Ctr. v. Nassar* (2013) 570 US 338, 360-363.)

4   Under this standard, the employer will not be liable if it proves it would have taken the

5   same action regardless of retaliatory animus. (*Id.*)

6    Here, uniquely, Defendant is internally inconsistent. On the one hand, Amanda

7   Nomura testified her understanding Plaintiff quit. (SSG Nos. 141-145). On the other,

8   tour manager Gugliotta testified that the Plaintiff was let go because it just wasn't

9   working out between the Amanda and Nomura. (SSG Nos. 141-145) Further adding

10   that the preferred reason is pretextual, Gugliotta testified she was willing to continue to

11   work with Plaintiff about Plaintiff's designed. (SSG Nos. 141-145). As Defendant's is

12   inconsistent from an evidentiary standpoint, it cannot meet its burden of showing that

13   the reason for Plaintiff leaving the tour is independent of any purported complaints or

14   other protected activity.

15    Even if Defendant were consistent regarding the adverse action, the temporal

16   proximity between the complaints and the adverse action create a genuine issue of fact.

17   "Causation sufficient to establish the third element of the prima facie case may be

18   inferred from circumstantial evidence, such as the employer's knowledge that the

19   plaintiff engaged in protected activities and the proximity in time between the protected

20   action and the allegedly retaliatory employment decision." (*Adetuyi v. City and County*

21   *of San Francisco* (N.D. Cal. 2014) 63 F.Supp.3d 1073, 1089; see also *Yartzoff v.*

22   *Thomas,* 809 F.2d 1371, 1376 (9th Cir.1987).) "At the prima facie stage of a retaliation

23   case, [t]he causal link element is construed broadly so that a plaintiff merely has to

24   prove that the protected activity and the negative employment action are not completely

25   unrelated." (*Poland v. Chertoff*, 494 F.3d 1174, 1180 n. 2 (9th Cir.2007).)

26    Here, Plaintiff's complaints were within 10 days of the very first written

27   complaint in February 24 (where Plaintiff pointed out she black and felt she was being

28   treated as a slave) and her departure in March 5. Still, Plaintiff testified that she made

-14-

1    various complaints throughout this 11 day period to Tour Manager Gugliotta regarding

2    not getting accommodated, sexually charged environment and that she was being

3    treated differently and to her detriment because of her race. (SSG Nos. 141-145.)

4    Because of the at least 11 day proximity between the complaint and the adverse action,

5    the inference of retaliatory motive exists which greats a genuine issue of fact.

### a.    *Plaintiff Seeks To Correct the Clerical Drafting Error and Separate Her Title VII Retaliation Claim from the ADA Retaliation Claim.*

9    The Second Amended Complaint has listed as the sixth cause of action

10    "Retaliation in Violation of Title VII." However, in the body of the complaint, the sixth

11    claim is title "Retaliation in Violation of the ADA" while actually citing Title VII

12    protected activity (i.,e., complaints sexual and racial harassment) in paragraph 112 of

13    the Second Amended Complaint. Plaintiff respectfully prays the Court allow for the

14    pleading to be corrected as this was a procedural/clerical error, that would not prejudice

15    the Defendants.

16    Rule 15 provides that "[t]he court should freely give leave [to amend the

17    pleadings] when justice so requires." Fed.R.Civ.P. 15(a)(2). In order for a court to seek

18    "justice," mere technical deficiencies should not prevent a meritorious action from

19    going forward. (*See, e.g., Simons v. United States,* 497 F.2d 1046, 1049 & n. 2 (9th

20    Cir.1974); *Smith v. Blackledge,* 451 F.2d 1201, 1202–03 & n. 2 (4th Cir.1971).) In this

21    Ninth Circuit, courts may construe other filings, including oppositions to motions, as

22    motions to amend where amendment would be proper. ( *See, e.g., Kaplan v. Rose,* 49

23    F.3d 1363 (9th Cir.1994); *Edwards v. Occidental Chem. Corp.,* 892 F.2d 1442, 1445 n.

24    2 (9th Cir.1990); *389 Orange Street Partners v. Ciarcia,* 179 F.3d 656, 665–66 (9th

25    Cir.1999); *see also Eddy v. Virgin Islands Water and Power Authority,* 256 F.3d 204,

26    209–10 (3d Cir.2001) (Alito, J.); *Grisham v. Philip Morris, Inc.* (C.D. Cal. 2009) 670

27    F.Supp.2d 1014, 1022.)

28    //

In fact, there is clear authority that "[a]n addition of new issues during the pendency of a summary judgment motion can be treated as a motion for leave to amend the complaint." *Kaplan,* 49 F.3d at 1370 (citing *Roberts v. Arizona Bd. of Regents,* 661 F.2d 796, 798 n. 1 (9th Cir.1981)); *see also* Schwarzer et al., *Federal Procedure Before Trial,* at § 14:27.1 ("courts *may* treat a party's raising new claims or defenses on a summary judgment motion as a *motion for leave to amend* the pleadings, which is normally granted *absent prejudice* to the opposing party.").

In deciding whether to grant Plaintiff's motion for leave to amend, the Court notes that the Ninth Circuit has "repeatedly stressed that the court must remain guided by 'the underlying purpose of Rule 15 ... to facilitate decision on the merits, rather than on the pleadings or technicalities.' " *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir.2000) (quoting *Noll v. Carlson,* 809 F.2d 1446, 1448 (9th Cir.1987)). "This policy is to be applied with extreme liberality." *Eminence Capital, L.L.C. v. Aspeon, Inc.,* 316 F.3d 1048, 1051 (9th Cir.2003).) The Supreme Court has outlined five factors to be used in considering a motion to amend, stating:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given." (*Foman v. Davis,* 371 U.S. 178, 182 (1962).)

Of these factors, "it is the consideration of prejudice to the opposing party that carries the greatest weight." (*Eminence Capital, L.L.C. v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir.2003); see also *Grisham, supra*, at 1023.)

Here, there is no prejudice as Defendants discovery included inquiries of what the complaints were Plaintiff made about the racial harassment (a separate claim) and the sexual harassment claim (another, separate claim). Then, discovery was conducted as to the claim of unlawful harassment in the context of Plaintiff's complaint. As

demonstrated in Genuine Disputed Facts Nos. 141-145, Plaintiff testified she told Tour Manager Gugliotta of the lack of accommodation for her injury and illness (i.e., disability), Plaintiff's perspective she was being treated differently because of her race, and Plaintiff's perspective regarding a sexually charged environment.  (See *ibid*.)

This drafting error was not noticed until counsel for Plaintiff was there was no attack on the Title VII retaliation claim in the moving papers despite it listed on the caption page.  Then, counsel for Plaintiff was the error in the body of the complaint.

As there is no prejudice to the defendant as it did garner discovery on the topic of retaliation based on complaints of race and sex harassment (protective activities under Title VII), Plaintiff respectfully prays the Court permit the correction of this error by way of amendment.

### 2.    *ADA Retaliation*

Under the ADA, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). *West v. PBC Management LLC* (N.D. Cal. 2024) 754 F.Supp.3d 914, 922.)  "To establish a prima facie case of retaliation under the ADA, a plaintiff must show that: (1) he engaged in protected activity; (2) suffered an adverse ... action; and (3) there was a causal link between the two. Pardi v. Kaiser Foundation Hospitals, 389 F.3d 840, 849 (9th Cir. 2004) (citing Brown v. City of Tucson, 336 F.3d 1181, 1186–87 (9th Cir. 2003)).

Daniels easily satisfies the prima facie elements for ADA retaliation. First, she engaged in protected activity by repeatedly requesting reasonable accommodations for her injured ankle, bleeding nail-bed wounds, and allergic reaction, and by opposing the denial of those accommodations. (SSG Nos. 91–104, 105–108, 109–114, 128–135.) Second, she suffered an adverse employment action when she was abruptly removed from the tour on March 5, 2023, and placed on a same-day flight home. (SSG Nos. 1, 2, 136.) Third, the causal link is supported by the tight temporal proximity—her 6:15 a.m. text requesting medical attention preceded the termination decision by a matter of

-17-

hours—and by Gugliotta's admission that Nomura "wanted her gone," which came after weeks of Daniels's accommodation requests and complaints. (SSG Nos. 133–137.) Under *Pardi v. Kaiser Foundation Hospitals*, 389 F.3d 840, 849 (9th Cir. 2004), and *Brown v. City of Tucson*, 336 F.3d 1181, 1186–87 (9th Cir. 2003), this evidence is sufficient to create a genuine dispute as to whether Defendants retaliated against Daniels for exercising rights protected by the ADA.

### 3.    *FLSA Retaliation*

Too prevail on a retaliation claim under the FLSA, a plaintiff must first make a prima facie showing that: (1) [she] engaged in activity protected by the FLSA; (2) defendant took an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *1165 *Stewart v. Masters Builders Ass'n of King & Snohomish Cntys.*, 736 F. Supp. 2d 1291, 1295 (W.D. Wash. 2010

Here, Daniels satisfies each element of a prima facie FLSA-retaliation claim. She engaged in protected activity by repeatedly objecting to her extreme work schedule—working from roughly 6:00 a.m. until 2:00 a.m., seven days a week, without reliable breaks—and by texting Tour Manager Gugliotta that she was "worked to the bone" and denied rest, which constitutes opposition to practices prohibited by the FLSA (SSG Nos. 138–139). Defendants then took an adverse employment action when they terminated her on March 5, 2023, and booked her on a same-day flight home (SSG Nos. 1, 2, 136). The causal link is supported by the tight temporal proximity between Daniels's wage-and-hour complaints and her firing, as well as Gugliotta's admission that Nomura "wanted her gone" after weeks of those complaints (SSG Nos. 133–137, 140). Under *Stewart v. Masters Builders Ass'n of King & Snohomish Counties*, 736 F. Supp. 2d 1291, 1295 (W.D. Wash. 2010), this evidence creates a genuine dispute of material fact on the FLSA retaliation claim.

### V.    CONCLUSION

Based on the forgoing, Plaintiff respectfully prays the Court finds genuine issues of fact as to all her claims, and deny the present motion for summary judgment or

-18-

1    adjudication.

2

3

4    Respectfully submitted,

5

6    Dated:  August 1, 2025          WEST COAST EMPLOYMENT LAWYERS, APLC

7

8                                    BY: _____

9                                         Ronald L. Zambrano, Esq.
                                          Attorney for Plaintiff,
10                                        ASHA DANIELS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

# PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen and not a party to the within action.  My business address is 1147 South Hope Street, Los Angeles, CA 90015.

On August 1, 2025, I served the foregoing documents described as: **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT BIG GRRRL BIG TOURING, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** on the interested parties in this action by placing a true copy or original thereof enclosed in a sealed envelope, addressed as follows: **SEE MAILING LIST**

☐    **BY MAIL (FRCP 5):** I am readily familiar with the firm's practice of collection and processing documents for mailing.  Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐    **BY FACSIMILE TRANSMISSION (FRCP 5):** I caused such documents to be delivered via facsimile transmittal to the office of the addressee.  The transmission(s) reported as complete and without error.

X    **BY ELECTRONIC MAIL (FRCP 5(b)2(E)):** I caused such documents to be to be sent from the e-mail address nefthaly@westcoasttriallawyers.com to the persons at the e-mail address(es) listed in the mailing list. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐    **BY OVERNIGHT DELIVERY (FRCP 5):** I caused such documents to be delivered via express service carrier to the office of the addressee.

☐    **BY PERSONAL SERVICE (FRCP 5):** I caused such documents to be hand-delivered to the office of the addressee.

☐ State        X Federal

I declare under penalty of perjury pursuant to the laws of the State of California and the Federal Government of the United States of America that the foregoing is true and correct.

Executed on August 1, 2025, at Los Angeles, California.    _____

                                                                                        Madilaine Yazon Venzon

-1-

PROOF OF SERVICE

**MAILING LIST**

Martin D. Singer, Esq.
  *mdsinger@lavelysinger.com*
Michael E. Weinstein, Esq.
  *mweinsten@lavelysinger.com*
Melissa Y. Lerner, Esq.
  *mlerner@lavelysinger.com*

Megan Mallonee
  *mmallonee@lavelysinger.com*
Noelia Echesabal
  *nechesabal@lavelysinger.com*

LAVELY & SINGER, APC
2049 Century Park East, Suite 2400
Los Angeles, California 90067-2906

Counsel for Defendants,
Big Grrrl Big Touring, Inc., Melissa Jefferson
(aka "Lizzo"), and Carlina Gugliotta