UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ASHA DANIELS,

Plaintiff,

v.

BIG GRRRL BIG TOURING, INC., *et al.*,

Defendants.

Case No. 2:24-cv-03571-FLA (PVCx)

**ORDER GRANTING DEFENDANT BIG GRRRL BIG TOURING, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT [DKT. 57]**

## RULING

Before the court is Defendant Big Grrrl Big Touring, Inc.'s ("BGBT") Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Motion"). Dkt. 57 ("Mot.").[1] Plaintiff Asha Daniels ("Plaintiff") opposes the Motion. Dkt. 59 ("Opp'n"). On August 18, 2025, the court found this matter appropriate for resolution without oral argument and vacated the hearing set for August 22, 2025. Dkt. 73; *see* Fed. R. Civ. P. 78(b); Local Rule 7-15.

[1] The court cites documents by the page numbers added by the court's CM/ECF System, rather than any page numbers listed natively.

For the reasons stated herein, the court GRANTS the Motion and ENTERS summary judgment in Defendant's favor as to Plaintiff's remaining causes of action against BGBT. Defendant's Request for Judicial Notice (Dkt. 58) is DENIED and Defendant's Evidentiary Objection (Dkt. 63-2) is OVERRULED, as these documents are not material to the court's decision. Plaintiff's request for leave to amend the Second Amended Complaint ("SAC") is DENIED.

## BACKGROUND

On April 1, 2024, Plaintiff filed the operative SAC, asserting eight causes of action against BGBT for: (1) hostile work environment – sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1); (2) racial harassment in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1); (3) disability discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112(a); (4) failure to accommodate in violation of the ADA, 42 U.S.C. § 12112(b)(5)(A); (5) failure to engage in the interactive process in good faith in violation of the ADA; (6) retaliation in violation of the ADA, 42 U.S.C. § 12203; (7) retaliation in violation of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 215(a)(3); and (8) unpaid overtime in violation of the FLSA, 29 U.S.C. § 207(a)(1). Dkt. 3-1 at 326–69 ("SAC").[2] On December 2, 2024, the court issued the Order Granting Defendants' Motion to Dismiss ("December 2024 Order"), in which the court dismissed without leave to amend Plaintiff's cause of action for unpaid overtime in violation of the FLSA. Dkt. 28 at 4–6. Only Plaintiff's

---

[2] In the SAC, Plaintiff also asserted claims against former Defendants Melissa Jefferson (a/k/a Lizzo, "Lizzo"), Amanda Nomura ("Nomura"), Carlina Gugliotta ("Gugliotta"), and CAPS Payroll ("CAPS"). On April 30, 2024, Nomura was dismissed from the action at Plaintiff's request. Dkt. 3-1 at 371. On December 2, 2024, the court dismissed without leave to amend Plaintiff's claims against former Defendants Lizzo and Gugliotta. Dkt. 28. On December 12, 2024, the court dismissed Plaintiff's claims against CAPS without prejudice, for failure to complete service. Dkt. 36.

first through seventh causes of action against BGBT remain.

"Plaintiff was hired by BGBT to work from February 14 through March 17, 2023 as the 'Wardrobe Assistant' on the European/United Kingdom leg of [Lizzo's] arena tour, The Special Tour ('Tour')." Dkt. 57-1 (Def. Statement of Uncontroverted Facts, "Def. SUF") ¶ 2; Dkt. 59-1 (Pl. Statement of Genuine Disputes of Material Fact, "Pl. SGDF") ¶ 2. According to Plaintiff, she was subjected to "degradation, forced physical labor, denial of medical care, sexual harassment, and racial harassment" during her employment and wrongfully terminated for raising these issues with Gugliotta, who was the Tour Manager. SAC ¶¶ 16, 32–34.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The substantive law determines which facts are material; only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248.

"A moving party without the ultimate burden of persuasion at trial … has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "[T]o carry its burden of production, the moving party must produce either evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.* "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the

court that there is no genuine issue of material fact." *Id.*

"If … a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). Inferences may be drawn from underlying facts that are either not in dispute or that may be resolved at trial in favor of the nonmoving party, but only if they are "rational" or "reasonable" and otherwise permissible under the governing substantive law. *Id.* The court must view all evidence and justifiable inferences "in the light most favorable to the nonmoving party." *Id.* at 630–31. However, a party cannot defeat summary judgment based solely on the allegations or denials of the pleadings, conclusory statements, or unsupported conjecture. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003); *see also FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").

## II. Analysis

### A. Plaintiff's Title VII Discriminatory Harassment Claims

#### 1. Legal Standard for Harassment under Title VII

"Under Title VII, it is unlawful for an employer to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of

employment because of [her] race, color, religion, sex, or national origin." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003) (citing 42 U.S.C. § 2000e–2(a)(1)). "To prevail on a hostile workplace claim premised on either race or sex, a plaintiff must show: (1) that [she] was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Id*. "Because the elements to prove a hostile work environment are the same for both racial harassment and sexual harassment, cases analyzing both types of harassment are relevant to [the court's] analysis" of either type of claim. *Id.*

"To determine whether conduct was sufficiently severe or pervasive to violate Title VII, [courts] look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's work performance." *Id.* (internal quotation marks and citation omitted). "In addition, the working environment must both subjectively and objectively be perceived as abusive." *Id.* (cleaned up).

"Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at *discrimination* because of [race or] sex." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (cleaned up, italics in original). The Supreme Court "ha[s] never held that workplace harassment … is automatically discrimination because of [race or] sex merely because the words used have [racial or] sexual content or connotations." *Id.* "The critical issue … is whether members of one [race or] sex are exposed to disadvantageous terms or conditions of employment to which members of [other races or] the other sex are not exposed." *Id.* (internal quotation marks and citation omitted).

"[The] standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code. Properly applied, they will filter

out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [race or] gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (cleaned up). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment[.]" *Id.* "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (internal quotation marks and citations omitted). "[A]llegations of a racially [or sexually] hostile workplace must be assessed from the perspective of a reasonable person belonging to the racial or ethnic group [or sex] of the plaintiff." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1115–16 (9th Cir. 2004).

"[T]o prevail [on summary judgment] in a Title VII case, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in doing so, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct. If the defendant provides such a reason, the burden shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination." *Vasquez*, 349 F.3d at 640. "For a prima facie case, [the plaintiff] must offer evidence that gives rise to an inference of unlawful discrimination," either through the framework set forth in *McDonnell Douglas Corp. v. Green*[, 411 U.S. 792 (1973),] or with direct or circumstantial evidence of discriminatory intent." *Id.*[3]

/ / /

/ / /

---

[3] "Under *McDonnell Douglas*, unlawful discrimination is presumed if the plaintiff can show that (1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably. *Vasquez*, 349 F.3d at 640 n. 5 (internal quotation marks and citation omitted).

**2. First Cause of Action for Sexual Harassment**

Defendant moves for summary judgment on Plaintiff's Title VII sexual harassment claim on the grounds that Plaintiff has not and cannot identify any conduct by Defendant, or its employees, that demonstrates general hostility to women in the workplace or disparate treatment of men and women. Mot. at 23. It is undisputed that Plaintiff was not propositioned for sex or subjected to direct sexual advances. Pl. SGDF ¶ 63; Dkt. 63-1 ("Def. Resp. to Pl. SGDF") ¶ 63.

Plaintiff contends a trier of fact could find she was subject to a sexually hostile work environment because: (1) "[a] backstage equipment case emblazoned with photographs of erect penises remained in plain view for weeks and was later photographed and circulated in the crew's WhatsApp group after management took no remedial action, despite Daniels's complaints to Tour Manager Carlina Gugliotta"; (2) "[a] male coworker, Kyle, routinely carried penis-shaped candies, made lewd gestures, and told sexual jokes in the small wardrobe room where Daniels worked, conduct she likewise reported"; and (3) "[d]uring the overnight bus ride to Amsterdam, Nomura and other managers openly discussed hiring sex workers[] [and] attending live sex shows, … and those conversations continued after arrival." Opp'n at 12. Plaintiff misrepresents the evidence cited in her Opposition and supporting papers.

First, Plaintiff testified at her deposition that she saw the decorated case "throughout the day" on a single day of the Tour—not over a period of weeks as she now contends.[4] Dkt. 57-2 ("Lerner Decl.") at 41 (Pl. Dep. at 34:17:20 ("Q. How

---

[4] In the SAC, Plaintiff did not state she saw the case in-person and alleged only that a backstage manager sent a photograph of the case to a group chat which included Plaintiff and tour management. SAC ¶ 45. Defendant presents evidence "the Decorated Case was created for a crewmember's birthday on March 11, 2023, and was kept in Gugliotta's office for the entirety of that single day, after which the decorations were removed" (Def SUF ¶ 39), and that the photograph was sent to the

many times did you see that on tour? A. I saw it throughout the day. Q. On one day? A. I believe so.")), 39–40 (Pl. Dep. at 32:23–25, 33:7–8) ("Q. … And when did you first see this? A. … I cannot tell you an exact date but it was while I was on tour. … Q. … And it was [Kyle's] birthday? A. I believe so.").

Second, Plaintiff testified she observed Kyle perform sexually suggestive movements with penis-shaped candies and direct sexually suggestive remarks to unspecified other people on unspecified occasions. Lerner Decl. at 225–26 (Pl. Dep. at 245:19–246:6) ("Q. … What did Kyle do with respect to the dick pictures that you found to be so offensive? A. So he had dick candies in like, I don't know, like small dick figurines maybe that he had around and he would make, like sexually suggestive, I guess, movements and remarks. Q. Now, Kyle is a gay man; is that correct? A. That is correct. I believe so. Q. … Was he making these comments and suggestions to you personally? A. No. Q. … You observed it? A. Yes.").

Contrary to Plaintiff's assertion in the Opposition that this conduct occurred "routinely" during her employment, Opp'n at 12, Plaintiff testified Kyle engaged in this behavior on a single day—his birthday. Lerner Decl. at 228 (Pl. Dep. at 248:2–4, 11–16) ("Q. … And this is in Amsterdam? A. I can't say for sure that it was in Amsterdam but I believe it was. … Q. Was he moving around with a bag of the big dicks? A. Yes. So like I was saying, I can't stick him to one place because he moved

---

group chat on the same day (Def. SUF ¶¶ 34–35; Lerner Decl. at 199 (photograph of the decorated case and Kyle with the boxes of "dick candies"). Plaintiff's employment was terminated on March 5, 2023, but she remained a member of the group chat in question until March 13, 2023. Def. SUF ¶¶ 12, 34; Pl. SGDF ¶ 2. Plaintiff's testimony that she only saw the decorated case on a single day, Kyle's birthday, is consistent with Defendant's evidence and suggests Plaintiff's testimony about seeing the case in-person is false or misremembered. Nevertheless, the court cannot make credibility determinations on summary judgment, *see T.W. Elec. Serv.*, 809 F.2d at 631, and assumes for purposes of the subject Motion that there is a genuine dispute as to whether Plaintiff saw the case in-person during her employment with BGBT.

around with it and he had it throughout the day, other people had it throughout the day.").[5] Plaintiff additionally testified that, while Kyle's conduct made her "feel uncomfortable," she "wouldn't say [she] was offended," and it did not affect her job performance. *Id.* at 230–31 (Pl. Dep. at 250:16–251:3).

Third, Plaintiff testified she observed Nomura laughing during the bus ride to Amsterdam, while an unknown number of unidentified crew members of both genders engaged in a conversation in which they joked about hiring sex workers and visiting sex clubs. Pl. SGDF ¶ 44; Lerner Decl. at 55–66 (Pl. Dep. at 57:15–68:9). According to Plaintiff, BGBT employees repeated the same conversation on other unspecified occasions while the Tour was in Amsterdam, as "this was normal conversation throughout the day in many different spaces." *Id.* at 83–89 (Pl. Dep. at 85:10–91:8). Plaintiff, however, was unable to name, identify, or describe a single person who was part of this conversation, despite having spent weeks with them on the same bus. *Id.* at 84–85 (Pl. Dep. at 86:22–18) ("Q. … Can you tell me – How many of them were there? A. I couldn't tell you because these were not people I considered friends and that I intentionally had disgusting conversations like this with so no.").

Even when viewed in the light most favorable to Plaintiff and assuming these incidents occurred exactly as Plaintiff testified, these incidents are insufficiently severe or pervasive to amount to a discriminatory change in the terms and conditions

---

[5] As with the decorated case, Plaintiff did not plead these facts in the SAC, and first raised this alleged conduct as a basis for her sexual harassment claim at her deposition. *See* SAC; Def. SUF ¶ 52. Plaintiff's testimony makes clear that Kyle's alleged conduct would have occurred on the same day Plaintiff saw the decorated case. *See* Lerner Decl. at 225 (Pl. Dep. at 245:11–24) ("Q. … Did Kyle do something that you found to be offensive? A. The big thing with Kyle was the dick pictures. Q. … Did Kyle create that display that you found to be offensive? A. I don't know who created it. Q. … What did Kyle do with respect to the dick pictures that you found to be so offensive? A. So he had dick candies in like, I don't know, like small dick figurines maybe that he had around and he would make, like, sexually suggestive, I guess, movements and remarks.").

of Plaintiff's employment.[6] *See Faragher*, 524 U.S. at 788; *Oncale*, 523 U.S. at 80. It is undisputed that Kyle's alleged conduct and remarks were not directed at Plaintiff personally, that the decorated case and Kyle's conduct with the candies only occurred on one day—his birthday. It is also undisputed that the conversation regarding hiring sex workers and visiting sex clubs did not involve, and was not directed to, Plaintiff, and would have only occurred during the trip to, and while the Tour was in, Amsterdam. Additionally, while Plaintiff testified these incidents made her feel uncomfortable, she also testified they did not affect her performance of her job duties.

Plaintiff did not identify any conduct by Nomura or Defendant's other employees to demonstrate general hostility to women in the workplace or disparate treatment of men and women. This alleged conduct and these alleged incidents, while inappropriate and unprofessional, fall within the scope of what the Supreme Court has held to be outside the protection of Title VII as part of the "ordinary tribulations of the workplace[.]" *See Faragher*, 524 U.S. at 788.

The court, therefore, GRANTS the Motion as to the first cause of action for sexual harassment in violation of Title VII.

**3. Second Cause of Action for Racial Harassment**

Defendant moves for summary judgment on Plaintiff's racial harassment claims on the grounds that Plaintiff does not present any direct evidence Nomura was motivated by discriminatory intent or of any conduct that was sufficiently severe or

---

[6] At deposition, Plaintiff also testified that unidentified people invited her to go to an unidentified place in Amsterdam's red-light district. Lerner Decl. at 89–91 (Pl. Dep. at 91:9–93:14). Plaintiff, however, also testified she "[was] not exactly sure what the name of it was and what it was," and could not say if the establishment was a bar or a sex club. *Id.* at 90 (Pl. Dep. at 92:17–23). As Plaintiff did not identify this allegation as part of her sexual harassment claim in her Opposition, the court does not include this incident in its analysis of the claim. The court, however, notes that this testimony is too vague, indefinite, and lacking in any details to support a sexual harassment/ hostile work environment claim.

pervasive to support a discriminatory harassment claim under Title VII, based on race.[7] Mot. at 25–27. It is undisputed that Plaintiff did not personally observe anyone use derogatory racial slurs during her employment with Defendant. Def. Resp. to Pl. SGDF ¶ 74. Plaintiff responds she "was subjected to a drumbeat of racially charged conduct" by Nomura, which "[v]iewed cumulatively and from the perspective of a reasonable Black woman, … easily satisfies the 'severe or pervasive' requirement[.]" Opp'n at 14–15. The court will evaluate and address the conduct identified in the Opposition individually and based on its cumulative effect as a whole.

First, Plaintiff argues "Nomura repeatedly referred to Black women on the tour, including dancers and Daniels herself, as 'dumb,' 'useless,' and 'fat,' mocked their bodies, and laughed when they soiled costumes."[8] Opp'n at 14 (citing Pl. SGDF ¶¶ 74–79).[9] Plaintiff misrepresents her deposition testimony by combining and conflating multiple, unrelated incidents alleged regarding distinct groups of people.

At her deposition, Plaintiff testified that Nomura sent three local workers home early during the three weeks Plaintiff was with the Tour because "[s]he felt like they were dumb and lazy." Lerner Decl. at 160–61 (Pl. Dep. at 178:2–179:13). Only one of these three women was Black. *Id.* at 161 (Pl. Dep. at 179:6–9).[10] Plaintiff also testified BGBT hired over thirty local workers during Plaintiff's employment with Defendant, and that there were other Black local workers who were not sent home

---

[7] Plaintiff testified at deposition that Nomura is "half Asian." Lerner Decl. at 113 (Pl. Dep. at 116:15–16). For purposes of the subject Motion, the court will assume from this testimony that Nomura is half-white and half-Asian.

[8] Lizzo's back-up dancers on the tour were called the "Big Grrrls." Def. SUF ¶ 7.

[9] Many, if not most, of Plaintiff's citations to her separate statement appear to be one number lower than the relevant statements. The court has reviewed all relevant statements, including those beyond the specific statements cited.

[10] Plaintiff testified that one worker was Black, one was Indian, and that Plaintiff could not remember the race of the third worker, but she was a "woman of color"—which she defined to include Asians. Lerner Decl. at 160 (Pl. Dep. at 178:7–21).

early. *Id.* at 162–63 (Pl. Dep. at 180:15–181:5)), 165 (Pl. Dep. at 183:12–22). It is undisputed that Plaintiff never heard Nomura call her or any other Black person on the Tour "lazy." Pl. SGDF ¶ 80. There is no evidence presented to suggest Nomura called any other specific Black person or Black people in general "dumb" or "lazy." *See* Pl. SGDF. There is also no evidence presented to suggest Nomura called any person "useless." *See id.* Plaintiff did not identify any other abusive or harassing conduct directed toward Black local workers specifically, and testified only about conduct directed to local workers generally without any identification of race, or to local workers who were not Black.[11]

With respect to Plaintiff's assertion that Nomura "ridiculed dancers as 'fat,'" Opp'n at 8, Plaintiff testified Nomura "objectified the dancers and their bodies by talking about them being overweight and Lizzo by talking about her body and her being fat," which Plaintiff "found to be offensive in a sexual manner[.]" Lerner Decl. at 50 (Pl. Dep. at 50:2–9). Plaintiff did not testify she found these alleged statements racially offensive or that she believed Nomura referred to Lizzo and the Big Grrrls as "fat" or "overweight" because they were Black. *See id.*

But even if the court were to assume Plaintiff intended to testify that she also found these statements racially offensive, it is undisputed that one of the Big Grrrls, Noelle Rodriguez ("Rodriguez"), was not Black. Dkt. 104 ("Pl. Suppl. Br.") at 4–5; Dkt. 105 (Def. Suppl. Br.) at 2–3. As Plaintiff testified she did not know which of the Big Grrrls Nomura "was making fun of" when she allegedly spoke about the Big Grrrls, this evidence does not support Plaintiff's conclusion that Nomura made the

---

[11] Plaintiff testified that Nomura confronted and yelled at two white local workers for eating food set out for Tour members and staff. Lerner Decl. at 167–68 (Pl. Dep. at 185:11–186:6); *see also* Lerner Decl. at 177 (Pl. Dep. at 195:21–24 (testifying "[Nomura] did a lot of things that were racist but she also did a lot of abusive things to people that had nothing to do with race"). In the Opposition, Plaintiff also asserts Nomura "berated other crewmembers regardless of race." Opp'n at 8.

alleged statements because of racial animus against Black women. *E.g.*, Lerner Decl. at 155 (Pl. Dep. at 173:6–9) ("Q. … But you didn't know which dancers she was making fun of; is that correct? A. That is correct.").[12] There is also no evidence identified or presented to suggest Nomura ever stated, or even implied, she believed other specific Black women related to the Tour, such as Bree Runway ("Runway") and her back-up dancers,[13] or Black people in general, were "overweight" or "fat." *See* Opp'n; Pl. SGDF. Accordingly, even when viewed in the light most favorable to Plaintiff, no reasonable factfinder could find these alleged statements were racially motivated or established a racially abusive workplace environment.

Plaintiff's assertion that Nomura "laughed when [Big Grrrls] soiled costumes" (Opp'n at 8) is similarly deficient and does not support Plaintiff's Title VII racial harassment claim.[14] *See* Lerner Decl. 150–54 (Pl. Dep. at 168:1–172:4) (Plaintiff testified she was not part of the conversation and did not know which specific dancers Nomura was discussing/mocking).

/ / /

---

[12] While Plaintiff argues Rodriguez' race should not affect the court's analysis because she is "a person of color," Pl. Suppl. Br. at 4, Plaintiff did not assert claims for racial harassment against people of color generally and does not present any arguments, legal authority, or evidence to support such a broad claim.

[13] Runway and her backup dancers were the opening act on the tour. Def. SUF ¶ 11. It is undisputed that Runway, her tour manager, and her back-up dancers were all Black women. Pl. SGDF ¶ 68.

[14] At deposition, Plaintiff testified Nomura made the alleged statements regarding specific, unidentified Big Grrrls. *E.g.*, Lerner Decl. at 150 (Pl. Dep. at 167:3–7) ("[Nomura] would make fun of the smell of their costumes and … would talk about how this girl smells bad, this girl will have an accident and like soil her costume …."). Plaintiff did not testify that Nomura made these or similar statements regarding the Big Grrrls or Black women generally, or other specific Black women who were not Big Grrrls, and there is no evidence identified or presented to suggest Nomura spoke differently about any dancers who were not Black. To the contrary, Plaintiff testified Nomura "would regularly make fun of a lot of people," including people who were not Black. *Id.* at 182 (Pl. Dep. at 201:3–8).

Second, Plaintiff contends Nomura engaged in racially charged conduct because "[s]he snapped her fingers while mimicking a Big Grrrl in front of management, a gesture [Plaintiff] recognized as a stereotypical caricature of Black women." Opp'n at 14 (citing Pl. SGDF ¶¶ 71–73). At her deposition, Plaintiff testified she observed Nomura "mimicking one of the dancers and using, like, stereo typical gestures that make fun of a [B]lack woman, are kind of like set to call that woman ghetto." Lerner Decl. at 144 (Pl. Dep. at 161:7–12). Plaintiff, however, admitted she was not part of the conversation in question, did not know which Big Grrrl was being discussed/mimicked, did not know the context of Nomura's gesture, and could not testify to what specifically Nomura said. *Id.* at 144–48 (Pl. Dep. at 161:13–162:3, 162:24–163:8, 164:16–165:11). The only details Plaintiff provided were that "[t]hey were discussing something that one of the dancers said and [Plaintiff didn't] know exactly what." *Id.* at 147 (Pl. Dep. at 164:16–20).

According to Plaintiff, she knew Nomura was mocking a Black dancer because: "As a [B]lack woman[,] we know when we're being made fun of and called ghetto. It's something that probably any [B]lack woman you'd ever meet could tell you that at some point in her life, if not many, a non-[B]lack woman has used those gestures to make fun of her." *Id.* at 148 (Pl. Dep. at 165:6–11). But when questioned further by Defendant, Plaintiff clarified she was not testifying Nomura used the word "ghetto" during the conversation or actually accused anyone of being "ghetto," and that Plaintiff simply believed "[t]hat was the implication" of what Nomura was saying. *Id.* (Pl. Dep. at 165:13–22).

As Plaintiff admits she was not part of the conversation in question and did not know who specifically Nomura was allegedly talking about, what Nomura actually said, or the context in which the snapping gesture was allegedly made, Plaintiff's testimony is too vague and indefinite for a reasonable factfinder to find this conduct was objectively hostile and abusive to Black women. Plaintiff's subjective belief that Nomura implicitly called a Black woman "ghetto," during a conversation about which

Plaintiff had no specific, personal knowledge and did not know what actually was said, is insufficient to support a Title VII racial harassment claim.

Third, Plaintiff contends "Nomura imposed racially targeted restrictions by refusing Daniels's requests for larger dressing rooms, mirrors, and extra stockings for the Big Grrrls and the opening act." Opp'n at 7 (citing Pl. SGDF ¶¶ 64–67). With respect to the dressing room and mirrors, Plaintiff testified at deposition:

> The first day that I got on tour[,] … [Nomura was] kind of giving me the lay of the land, introducing me to certain people, showing me what different rooms are[,] and when she got to where the dancers' dressing room was, she was pointing out that there was not enough space or tools that they needed to get ready and telling me that they were going to blow up and kind of have a diva fit about it, and so me being new and on the job and a problem solver[,] I said, "Well, let's fix it. I can talk to Kyle," who … was in charge of putting people in different rooms. And I said, "I volunteer to talk to him," because I'm, like, "I'm a girls' girl. I can explain to him that we need more space," and I was instructed not to talk to him. And I said, "Okay, well, I can go to whatever the local, you know, similar store to Walmart is and get more mirrors, more tables so that the girls can have what they need to feel comfortable and perform good that night." And she told me no and to let it happen, and I found that offensive because as a [B]lack woman[,] a lot of times microaggressive things happen where we are kind of set up for failure, and I know that because I've experienced that in my own career[,] and so I thought it was offensive that these women were being set up to have a blowup and they, in fact, didn't ….

Lerner Decl. at 109–10 (Pl. Dep. at 112:9–113:14).

It is undisputed that Plaintiff was hired by BGBT to work as the "'Wardrobe Assistant' on the European/United Kingdom leg of [Lizzo's] arena tour," and that her responsibilities included "taking care of wardrobe for Lizzo's back-up dancers …, laundering and mending the Big Grrrls' garments, delegating tasks to local workers assisting with wardrobe, making sure the Big Grrrls had what they needed for their costumes, … and taking care of Lizzo's costumes when necessary." Pl. SGDF ¶¶ 2,

7.[15] Plaintiff does not present any evidence to establish it was within the scope of her responsibilities or authority to request an increase in the space allotted for the dancers' dressing room or the purchase of additional mirrors, tables, and other tools. *See* Opp'n; Pl. SGDF. Plaintiff, likewise, does not present any evidence to establish Nomura had such authority. There is also no evidence presented to suggest any dancer complained about the size of the dressing room or requested additional mirrors, tables, or tools. According to Plaintiff, "they, in fact, didn't" "have a blowup." Lerner Decl. at 110 (Pl. Dep. at 113:12).

No reasonable factfinder could find Nomura's rejection of Plaintiff's offer to act outside the scope of her responsibilities to request a larger dressing room and purchase additional equipment and tools, that no dancer ever requested—before Plaintiff had ever seen the space being used by the dancers during a performance—was objectively hostile and abusive to Black women or otherwise exposed Black people to disadvantageous terms or conditions of employment to which members of other races were not exposed. Furthermore, as Plaintiff's offer was outside the scope of her responsibilities, Nomura had a legitimate, non-discriminatory reason to reject the offer. This incident cannot support Plaintiff's Title VII racial harassment claim. To the extent Plaintiff contends Nomura denied a request for extra stockings for the Big Grrrls, Plaintiff does not identify or present any evidence to support such assertion. *See* Opp'n; Pl. SGDF. The court will address Plaintiff's arguments regarding the opening act separately below.

/ / /

---

[15] Defendant contends Plaintiff's responsibilities also included "transporting wardrobe items during load-in and load-out at each venue." Def. SUF ¶ 7. Plaintiff responds that, "before accepting the position, she was explicitly promised she would not be performing physically demanding labor such as moving heavy cases or racks." Pl. SGDF ¶ 7. For purposes of the subject Motion, the court need not determine the scope of Plaintiff's responsibilities with respect to transporting wardrobe items.

Fourth, Plaintiff argues Nomura engaged in racially harassing and abusive conduct by refusing Plaintiff's request to provide stockings to the opening act (Runway and her dancers) and ordering BGBT's security to monitor Runway and her entourage on social media to find a pretext for their removal from the Tour. Opp'n at 7–8 (citing Pl. SGDF ¶¶ 64–70). As with Plaintiff's argument regarding the dressing room, Plaintiff does not present any evidence to establish it was within her responsibilities to assist Runway and her dancers with their wardrobe, that she was authorized to provide BGBT resources to Runway and her dancers, or that Nomura had such authority.

While Plaintiff argues Nomura rejected her request because Runway and her dancers were Black, there is no evidence in the record to suggest Nomura denied similar requests with respect to any of the Big Grrrls (all of whom but Rodriguez were Black) or granted similar requests when made on behalf of non-Black opening act artists and dancers in connection with this or any other tour. Plaintiff's testimony of how Nomura jealously guarded BGBT's resources from white local workers suggests she did not. *See* Lerner Decl. at 167–68 (Pl. Dep. at 185:11–186:6) (testifying that two white local workers told Plaintiff "[Nomura] had confronted them and yelled at them in the cafeteria and … snatched the food out of one of the young woman's hands and told them they could not be eating the food"). Similarly, Plaintiff does not identify or present any evidence to suggest Nomura ordered BGBT's security to monitor any other Black person associated with the tour on social media (such as any of the Big Grrrls), or Black people generally, or refrained from such orders in connection with non-Black opening act artists and their staff on this or any other tour.

A reasonable factfinder, thus, could not find Nomura's treatment of Runway and her staff demonstrated racial animus against Black women or exposed Black women to disadvantageous terms or conditions of employment to which members of other races were not exposed. *See Oncale*, 523 U.S. at 80.

/ / /

Fifth, Plaintiff contends she suffered a racially hostile work environment because Nomura instructed Plaintiff not to speak with Lizzo, labeled her as "sexually appealing," and told her to "tone it down" to avoid making Lizzo jealous. Opp'n at 7–8, 15 (citing Pl. SGDF ¶¶ 15–16, 87–90). At deposition, Plaintiff testified Nomura "told [Plaintiff] that [she] was not allowed to interact with Lizzo because [she] was, like, sexually appealing," which Plaintiff "found to be offensive in a sexual manner," because "[Plaintiff] felt like that was really inappropriate to objectify [her] in that way." Lerner Decl. at 50 (Pl. Dep. at 50:3–12). Plaintiff did not testify that she found this statement to be racially offensive. *See id.*

Even if the court were to assume *arguendo* that Plaintiff intended to testify that she also found this statement racially offensive, Plaintiff does not identify or present any evidence that Nomura, or anyone related to Defendant, made similar statements to other Black people or did not make similar statements to or about non-Black people. *See* Opp'n; Pl. SGDF. To the contrary, Plaintiff testified Nomura "often had conversations about Lizzo saying that Lizzo was jealous of [Nomura], that Lizzo's boyfriend wanted to get with [Nomura] and that upset Lizzo." *Id.* at 182 (Pl. Dep. at 201:13–18). Nomura's alleged statement is insufficient to establish Black women were "exposed to disadvantageous terms or conditions of employment to which members of [other races were] not exposed," as is required to support Plaintiff's Title VII racial harassment claim. *See Oncale*, 523 U.S. at 80.

Sixth, Plaintiff contends Nomura "referred to Beyoncé with a racial slur" and "repeated a racial slur directed at Beyoncé … while [Plaintiff] was within earshot." Opp'n at 8, 16 (citing Pl. SGDF ¶¶ 74–79). At deposition, Plaintiff testified "[Nomura] said that Lizzo would talk about, like, women that we see as like [B]lack hero[e]s, like Beyonce, Megan Thee Stallion, Janet Jackson, and [Lizzo] would call them racial slurs and talk about them in a derogatory way." Lerner Decl. at 184 (Pl. Dep. at 203:15–24).

/ / /

Plaintiff did not identify the alleged racial slur(s) at her deposition or testify that Nomura repeated the racial slur(s) during the conversation. *See id.* There is no evidence identified or presented to suggest Nomura ever spoke a racial slur or referred to any specific Black person or Black people generally using racially offensive language. Def. Resp. to Pl. SGDF ¶ 74. Even when viewed in the light most favorable to Plaintiff, no reasonable factfinder could find that Nomura's alleged statement that Lizzo, a Black woman, used unspecified racial slurs when referring to other famous Black women vocalists established an objectively racially hostile workplace environment. *See Vasquez*¸ 349 F.3d at 642.

Finally, the court reviews all of Plaintiff's allegations regarding racially offensive conduct collectively for their total effect on a reasonable Black person. Even if the court were to assume for purposes of the subject Motion, that all of these incidents allegedly occurred exactly as Plaintiff testified at her deposition and Plaintiff subjectively found Nomura's conduct to be racially offensive, these incidents cannot support a claim for racial harassment under Title VII because no reasonable factfinder could find these incidents were sufficiently severe and pervasive to create a racially abusive work environment against Black people or exposed Black people to disadvantageous terms or conditions of employment to which members of other races were not exposed. *See Vasquez*, 349 F.3d at 642; *Oncale*, 523 U.S. at 80. These alleged incidents, both individually and collectively, fall outside the scope of Title VII protection as part of the "ordinary tribulations of the workplace[.]" *See Faragher*, 524 U.S. at 788.

The court, therefore, GRANTS the Motion as to the second cause of action for racial harassment in violation of Title VII.

**B. Third through Fifth Causes of Action for Disability Discrimination in Violation of the ADA**

The ADA prohibits covered entities from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). For purposes of the ADA, discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]" *Id.* § 12112(b)(5)(A).

To establish a prima facie case for failure to accommodate under the ADA, a plaintiff must show: "(1) she is disabled within the meaning of the ADA; (2) she is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) she suffered an adverse employment action because of her disability." *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (internal brackets omitted).

> The term "disability" means, with respect to an individual--
>
> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment ….

42 U.S.C. § 12102(1). "[I]n deciding whether the impairment is substantially limiting, courts must consider the nature and severity of the plaintiff's impairment, the duration or expected duration of the impairment, as well as the permanent or long term impact of the impairment." *Rohr v. Salt River Project Agric. Improvement and Power Dist.*, 555 F.3d 850, 858 (9th Cir. 2009) (cleaned up).

Plaintiff alleges she was disabled because: (1) she suffered from an injury to her foot and/or ankle when Nomura rolled a heavy rack of clothing over Plaintiff's foot; (2) she broke two acrylic nails past the nail bed while loading heavy cases; and (3) she suffered from an allergic reaction on the last day of her employment. SAC ¶¶ 91–93,

97; *see also* Opp'n at 17.[16] According to Plaintiff, she was denied medical treatment and accommodations for her injuries and allergic reaction. SAC ¶¶ 91–93, 97.

Defendant moves for summary judgment on Plaintiff's ADA claims on the grounds that Plaintiff's alleged injuries and allergic reaction were insufficiently severe or long-term to qualify as disabilities under the ADA. Mot. at 27–28 (citing cases including: *Parks v. Port of Oakland*, Case No. 4:16-cv-04061-HSG, 2017 WL 2840704, at *4 (N.D. Cal. July 3, 2017) ("Temporary injuries such as broken or fractured bones do not generally qualify as a disability within the meaning of the ADA.") (internal quotation marks and citation omitted); *Square v. Potter*, Case No. 2:07-cv-07052-PA (JTLx), 2009 WL 10671413, at *6–7 (C.D. Cal. June 22, 2009) ("[T]here is no indication that Congress intended the definition to cover common ailments such as lower back and knee pain, when such pain does not appreciably interfere with either a person's daily living activities or job."), *aff'd sub nom. Square v. Donahue*, 430 F. App'x 633 (9th Cir. 2011); *Alphonsis v. Century Reg'l Det. Facility*, Case No. 2:17-cv-03650-ODW (DFM), 2017 WL 11505981, at *12 (finding two instances where plaintiff suffered an allergic reaction, "neither of which appear to have been particularly severe (e.g., she does not allege that she was hospitalized)" insufficient to constitute a disability under the ADA)).

It is undisputed Plaintiff "did not observe broken bones or broken skin on her right foot or ankle" (Pl. SGDF ¶ 93), and the injury only "resulted in bruising and

[16] At deposition, Plaintiff testified she did not know what caused the reaction but believed it was food-related (Lerner Decl. at 297–98 (Pl. Dep. at 322:5–323:17)), and that her stomach felt unsettled, her "skin felt itchy but like not rash itchy, just kind of like inflamed maybe, and [she] just felt like a little dizzy, a little woozy" (*id.* at 299–300 (Pl. Dep. at 324:23–325:9)). According to Plaintiff, her only food allergy is to processed orange juice, which she did not have that morning and does not believe caused the reaction. *Id.* (Pl. Dep. at 322:13–323:2). Plaintiff further testified that she did not know for certain that she actually had an allergic reaction. *Id.* at 300 (Pl. Dep. at 323:18–22).

swelling." Pl. SGDF ¶¶ 93–94. It is also undisputed Plaintiff did not request over-the-counter pain medication at any of the hotels she stayed at during the tour (*id.* ¶ 97; Lerner Decl. at 254–55 (Pl. Dep. at 277:23–278:1)), crutches to accommodate her injury (Pl. SGDF ¶ 102; Lerner Decl. at 137 (Pl. Dep. at 153:13:14)), or time off to leave the venue and visit a doctor (Pl. SGDF ¶ 103; Lerner Decl. at 136–37 (Pl. Dep. at 152:1–153:12)). Plaintiff also testified she did not see a doctor for her alleged foot injury after she returned home in March, 2023. Lerner Decl. at 137–38 (Pl. Dep. at 153:23–154:8). With respect to her broken acrylic nails and alleged allergic reaction, Plaintiff testified she was able to continue work after bandaging her bleeding nail-beds and "taking a pill given by a chef." Pl. SGDF ¶¶ 116, 120.

The court does not seek to minimize or disregard the pain Plaintiff felt from these injuries and allergic reaction, or her belief that she was entitled to better care and treatment than she received from Defendant and its employees. Nevertheless, these injuries do not qualify as disabilities under the ADA. *See Ellis v. City of Reedley*, Case No. 1:05-cv-01474-AWI (SMS), 2007 WL 1098571, at *11 (E.D. Cal. Apr. 12, 2007) ("[T]he term 'disability' may incorporate a condition of only temporary duration, but … the condition must have at least a minimum duration within the time period relevant to the claim that is sufficient to constitute an actual limitation of a major life activity, as opposed to simply the need to take a day off.").

Plaintiff does not address Defendant's cases in her Opposition or cite any legal authority to establish that these types of injuries can qualify as disabilities under the ADA. *See* Opp'n at 17–19. Instead, Plaintiff argues that "[m]anagement's awareness of her conditions—evidenced by [Plaintirff's] requests to sit, move bunks, receive bandages, ice, or a doctor—establishes both a record of impairment and that she was at least regarded as disabled." *Id.* at 17. Because Plaintiff's alleged injuries and allergic reaction did not qualify as disabilities under the ADA, Defendant's alleged awareness of these conditions is insufficient to support Plaintiff's ADA claims.

/ / /

Accordingly, the court GRANTS the Motion as to the third through fifth causes of action for Plaintiff's failure to establish a *prima facie* case of disability discrimination due to the lack of a qualifying disability.

**C. Sixth Cause of Action for Retaliation in Violation of the ADA**

The ADA provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Plaintiff alleges "Defendants' adverse actions, including, but not limited to, Plaintiff's termination, and failure to accommodate, were at least in part, in retaliation for Plaintiff's disability[.]" SAC ¶ 112.

Defendant moves for summary judgment on the sixth cause of action on grounds including that Plaintiff cannot establish a *prima facie* case of ADA retaliation. Mot. at 31. "To establish a prima facie case of retaliation under the ADA, an employee must show that: (1) he or she engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal link between the two." *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 849 (9th Cir. 2004). "If the employee establishes a prima facie case, the employee will avoid summary judgment unless the employer offers legitimate reasons for the adverse employment action, whereupon the burden shifts back to the employee to demonstrate a triable issue of fact as to whether such reasons are pretextual." *Id.*

Having found Plaintiff failed to establish a *prima facie* case for discrimination under the ADA, the court likewise finds Plaintiff cannot establish a *prima facie* case for retaliation under the ADA because Plaintiff's alleged injuries did not qualify as disabilities. The court, therefore, GRANTS the Motion as to the sixth cause of action.

**D. Seventh Cause of Action for Retaliation in Violation of the FLSA**

The FLSA makes it unlawful for any person "to discharge or in any other manner discriminate against any employee because such employee has filed any

complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee[.]" 29 U.S.C. § 215(a)(3). "To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection. This standard can be met, however, by oral complaints, as well as by written ones." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011).

The seventh cause of action alleges "Plaintiff was discharged in retaliation for raising complaints about wage and hour violations." SAC ¶ 139. Defendant moves for summary judgment on the grounds that there is no evidence Plaintiff raised complaints about rights protected under the FLSA. Mot. at 32. Plaintiff responds that "[s]he engaged in protected activity by repeatedly objecting to her extreme work schedule—working from roughly 6:00 a.m. until 2:00 a.m., seven days a week, without reliable breaks—and by texting Tour Manager Gugliotta that she was "worked to the bone" and denied rest, which constitutes opposition to practices prohibited by the FLSA …." Opp'n at 24 (citing Pl. SGDF ¶¶ 138–39).

The SAC and Opposition make clear that Plaintiff's retaliation claim is based on her alleged complaints to Defendant regarding the conduct underlying her ninth cause of action for unpaid overtime in violation of the FLSA. *See* SAC ¶¶ 138–159; Opp'n at 24. As stated in the December 2024 Order, the wage and hour provisions of the FLSA (29 U.S.C. §§ 206–207) do not apply "with respect to any employees whose services during the workweek are performed in a workplace within a foreign country." Dkt. 28 at 5 (citing 29 U.S.C. § 213(f)). Complaints about such work cannot support a FLSA retaliation claim. *See* 29 U.S.C. § 213(f).

Plaintiff does not present any evidence she made any complaints to BGBT or its employees in connection with work performed within the United States. *See* Opp'n at 24; Pl. SGDF. To the contrary, it is undisputed that Plaintiff was only hired to work

"on the European/United Kingdom leg of … Lizzo's … arena tour[.]" Pl. SGDF ¶ 2.[17] The court, therefore, finds Plaintiff cannot establish a *prima facie* case for retaliation under the FLSA, as she does not present any evidence she complained to BGBT of protected activity under the FLSA.

Accordingly, the court GRANTS the Motion as to the seventh cause of action.

### III. Request for Leave to Amend the SAC to Add a Cause of Action for Retaliation in Violation of Title VII

Plaintiff requests leave to amend the SAC to assert an additional claim for retaliation in violation of Title VII. Opp'n at 21–23. According to Plaintiff,

> The Second Amended Complaint has listed as the sixth cause of action "Retaliation in Violation of Title VII." However, in the body of the complaint, the sixth claim is title "Retaliation in Violation of the ADA" while actually citing Title VII protected activity (i.,e., complaints sexual and racial harassment) in paragraph 112 of the Second Amended Complaint. Plaintiff respectfully prays the Court allow for the pleading to be corrected as this was a procedural/clerical error, that would not prejudice the Defendants.

Opp'n at 21 (errors in original).

"An addition of new issues during the pendency of a summary judgment motion can be treated as a motion for leave to amend the complaint." *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994), *overruled in part on unrelated grounds in City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017). "[W]hen a party seeks to amend a pleading after the pretrial scheduling order's deadline for amending the pleadings has expired, the moving party

---

[17] No evidence was presented to establish Plaintiff performed any work within the United States during her employment with BGBT. Although Plaintiff argues she was asked to join the tour and hired "specifically because she had previously designed custom pieces for the Big Grrrls and was expected to oversee their alterations and repairs" (Pl. SGDF ¶ 14), Plaintiff does not present any evidence to establish such design work was performed during her employment with Defendant or otherwise supports her FLSA retaliation claim.

must satisfy the 'good cause' standard of Federal Rule of Civil Procedure ['Rule'] 16(b)(4), which provides that a schedule may be modified only for good cause and with the judge's consent, rather than the liberal standard of Federal Rule of Civil Procedure 15(a)." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 737 (9th Cir. 2013) (internal brackets and quotation marks omitted).

"Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). If good cause is shown, the court applies the standard under Rule 15 to determine whether amendment is proper. *Id.* at 608. As the last date to hear a motion to amend pleadings or add parties expired on September 27, 2024 (Dkt. 21 at 3), Plaintiff must establish good cause and diligence before the court considers Plaintiff's request on its merits. Plaintiff does not meet her burden.

Contrary to Plaintiff's assertion that the sixth cause of action was listed as a claim for retaliation in violation of the ADA through "a procedural/clerical error," the SAC expressly alleges: "At all times mentioned in this complaint, Defendant regularly employed 15 or more persons, bringing Defendants within the provisions of American's With Disabilities Act ('ADA') with prohibits an employer from taking an adverse action against an individual who has opposed any practice the ADA makes unlawful. (42 USC § 12203; 29 CFR §§ 1630.8, 1630.12 & Pt. 1630, App. § 1630.8.)." SAC ¶ 111 (errors in original). The sixth cause of action does not cite Title VII or identify the applicable statute for a Title VII retaliation claim, 42 U.S.C. § 2000e-3(a). *See id.* ¶¶ 110–36.

Furthermore, paragraph 112 of the SAC does not focus solely on Title VII-related activity, as Plaintiff contends, and states instead: "<u>Defendants' adverse actions, including</u>, but not limited to, Plaintiff's termination, and <u>failure to accommodate, were at least in part in retaliation for Plaintiff's disability</u>, her complaints about sexual harassment, and her complaints about racial discrimination." *Id.* ¶ 112 (underline added). The sixth cause of action also pleads facts regarding her alleged injuries and

allergic reaction—which are unrelated and irrelevant to Plaintiff's Title VII sexual and racial harassment claims. *See id.* ¶¶ 121–23, 131, 135.

Although the sixth cause of action additionally pleads facts related to her Title VII claims (*e.g.*, SAC ¶¶ 116–20), Plaintiff pleaded the same or substantively identical facts in connection with the third and fourth causes of action for violation of the ADA and the seventh cause of action for violation of the FLSA. *See, e.g.*, *id.* ¶¶ 76–78, 80, 94–96, 98, 142–47, 152–56, 159–60. The inclusion of extraneous facts in connection with the sixth cause of action is insufficient to establish that Plaintiff intended to assert a claim for retaliation under Title VII instead of the ADA, as Plaintiff contends, and reflects instead a degree of inattention and carelessness that is indicative of Plaintiff's lack of diligence or good cause. *See, e.g.*, SAC ¶ 160 (arguing "[s]aid retaliation was and is in violation of §§ 1102.5 and 6310 of the Labor Code because the actual reason for terminating Plaintiff was for her complaints of Defendants' illegal activities, specifically, Defendants' sexual and racial harassment," even though Plaintiff did not plead California Labor Code claims in the SAC and these allegations are irrelevant to Plaintiff's FLSA retaliation claim). This is further demonstrated by the fact that Plaintiff seeks to maintain an ADA retaliation claim in addition to the Title VII retaliation claim she now seeks to bring. *See* Opp'n at 23–24.

Finally, Plaintiff's assertion that she did not notice her failure to plead a Title VII retaliation claim until she prepared the Opposition is insufficient to establish good cause, given that the December 2024 Order expressly identified the sixth cause of action as a claim for "retaliation in violation of the ADA against all Defendants," and did not list a Title VII retaliation claim. Dkt. 28 at 3. At minimum, the December 2024 Order put Plaintiff on notice that the court construed the sixth cause of action as a claim for retaliation in violation of the ADA, and no Title VII retaliation claim had been pleaded in the SAC. Plaintiff does not offer any reasonable explanation for why it took her fifteen months after the filing of the SAC and eight months after the court issued the December 2024 Order to seek leave to add a Title VII retaliation claim. *See*

Opp'n at 21–23.

Accordingly, the court finds Plaintiff fails to establish diligence or good cause for the court to grant leave to add a Title VII retaliation claim.

**CONCLUSION**

For the aforementioned reasons, the court GRANTS the Motion and ENTERS summary judgment in Defendant's favor as to all of Plaintiff's remaining causes of action against BGBT.[18] Defendant's Request for Judicial Notice (Dkt. 58) and Evidentiary Objection (Dkt. 63-2) are DENIED and OVERRULED, respectively, as not material to the court's decision. Plaintiff's request for leave to amend the SAC is DENIED.

IT IS SO ORDERED.

Dated: September 1, 2026

FERNANDO L. AENLLE-ROCHA
United States District Judge

---

[18] Having granted the Motion for the reasons stated, the court need not address the parties' remaining arguments.